UNITED STATES of America, Plaintiff,

v.

Francisco ROSARIO, Defendant.

No. 99 CR 608 RR.

United States District Court, E.D. New York.

Nov. 8, 2002.

Roslynn Mauskopf, United States Attorney for the Eastern District of New York by Alan Vinegrad, Assistant U.S. Attorney, Richard T. Faughnan, Assistant U.S. Attorney, Brooklyn, NY, for Plaintiff.

Richard Ware Levitt, Esq., Raymond R. Granger, Esq., New York City, for Defendant.

Memorandum and *ORDER*

RAGGI, Circuit J [1].

On August 9, 1997, Abner Louima, a prisoner in police custody, was taken in handcuffs to the bathroom of the 70th precinct in Brooklyn and brutally sodomized with a broken broomstick by officers of the New York City Police Department. Law enforcement efforts to investigate this crime and to bring those responsible to justice were seriously hampered by the fact that a number of police officers with relevant information deliberately lied to local and federal authorities. One of those officers was defendant Francisco Rosario.

Indicted for conspiring to make and actually making false statements to federal authorities on both September 22, 1997 and November 20, 1997, *see* 18 U.S.C. §§ 371, 1001, Rosario was convicted after a jury trial before the Hon. Eugene H. Nickerson on the September charges and acquitted on those from November. Sentenced to three years' probation with a special condition of three months' home detention, Rosario challenged his conviction in the United States Court of Appeals for the Second Circuit, arguing that his prosecution was barred by a November 1997 immunity agreement. In the alternative, he asserted that the trial court had both mishandled the prosecution's reverse *Batson* challenge during jury selection, *see Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); *Georgia v. McCollum*, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992) (applying *Batson* to juror challenges exercised by criminal defendants), and unfairly limited his attorney's summation. Reserving judgment on the

1. Sitting by designation.

alleged trial errors, the Court of Appeals remanded Rosario's case to the district court with directions "to conduct a hearing regarding the government's alleged promise of immunity." *United States v. Aleman,* 286 F.3d 86, 91–92 (2d Cir.2002).

As a result of Judge Nickerson's death earlier this year, it fell to this judge to conduct the ordered hearing. With the scope of the hearing expressly left to its discretion, *id.* at 92, the court, after consultation with the parties, requested evidence on the following disputed questions: (1) in November 1997, had prosecutors promised or the parties agreed that Rosario would receive immunity for past false statements and, if so, on what terms and conditions;[2] (2) insofar as any agreement or promise depended on Rosario telling the truth to federal authorities in a November 1997 interview, who was to decide if he complied with this condition; (3) if prosecutors were to determine if Rosario told the truth, was their decision that he had not done so reached in good faith; and (4) if the court was to decide if Rosario told the truth, did the record indicate that he had or had not done so.

Having heard evidence on May 28–29, 2002 and reviewed the parties legal memoranda, the court now concludes that (1) prosecutors did not promise and the parties did not agree that Rosario would receive immunity in return for telling the truth in November 1997; (2) in any event, Rosario understood that prosecutors, and not the court nor any third party, would decide if he told the truth at the November 1997 interview; (3) the prosecutors' decision that Rosario lied in November 1997 was reached honestly and in good faith; and (4) if this court were to decide the question of Rosario's truthfulness, it would similarly conclude that he had deliberately been untruthful.[3]

The court details the findings that support these conclusions.

## I. *No Immunity Agreement Was Reached by the Parties and No Promise of Immunity Was Made by the Prosecutors*

■ Rosario submits that in November 1997, he reached an agreement with federal prosecutors that granted him immunity from prosecution for past false statements

---

2. Prior to the hearing, Rosario submitted that the prosecution's failure to challenge the existence of an immunity promise or agreement in the initial proceedings before Judge Nickerson waived any contrary claim on remand. This court disagreed for reasons stated on the record on May 17, 2002. *See* Transcript of Status Conference at 8–10. To the extent Rosario persists in his waiver argument, the court adheres to its ruling.

3. In light of this last finding, the court need not address another possibility raised by the Court of Appeals, i.e., that Rosario might be entitled to immunity if, in November 1997, he told prosecutors what he subjectively believed to be the truth even though he was objectively incorrect. *See United States v. Aleman,* 286 F.3d at 90. Certainly, no defendant can be convicted pursuant to 18 U.S.C. § 1001 unless the prosecution proves beyond a reasonable doubt both the objective and subjective

falsity of a material statement. *See* 2 L. Sand et al., *Modern Federal Jury Instructions,* ¶ 36.01, Instruction 36–4 (2002) (to prove beyond a reasonable doubt that defendant has falsified a material fact, the government must show that the statement "is untrue at the time made and is known to be untrue at the time made"). But the Court of Appeals recently took a different view when a defendant sought a benefit that depended on her "truthfully" providing information to the prosecution. *See United States v. Reynoso,* 239 F.3d 143, 149 (2d Cir.2000) (holding that to qualify for "safety valve" consideration pursuant to 18 U.S.C. § 3553(f)(5), a defendant must show both that the information provided was objectively true and that she subjectively believed it to be true). This court's finding that Rosario was deliberately untruthful makes it unnecessary to consider if *Reynoso* has any application to this case.

in return for a truthful account of what he saw in the 70th precinct on August 9, 1997. Should the court find that the parties did not reach an actual agreement, Rosario submits that he is still entitled to immunity because he reasonably relied to his detriment on the prosecutors' promise to that effect. *See* Restatement (Second) of Contracts § 90 (1981) (discussing promissory estoppel). It is Rosario who bears the burden of proving the existence of such an immunity agreement or promise. *See United States v. McHan,* 101 F.3d 1027, 1034 (4th Cir.1996); *United States v. Sophie,* 900 F.2d 1064, 1071 (7th Cir.1990); *United States v. Hayes,* 646 F.Supp. 146, 151–52 (N.D.Ind.1986); *United States v. Holtz,* No. 92–00459, 1993 WL 482953, at *4 (E.D.Pa. Nov. 15, 1993), *aff'd* 31 F.3d 1174 (3d Cir.1994); *see also United States v. Castaneda,* 162 F.3d 832, 836 (5th Cir. 1998) (stating that immunity agreements are interpreted in accordance with general principles of contract law); *Whitney Holdings, Ltd. v. Givotovsky,* 988 F.Supp. 732, 739 (S.D.N.Y.1997) ("It is black letter law that the burden of proving the existence, terms and validity of a contract rests on the party seeking to enforce it") (quoting *Paz v. Singer,* 151 A.D.2d 234, 235, 542 N.Y.S.2d 10, 11 (1st Dep't 1989)); *Readco, Inc. v. Marine Midland Bank,* 81 F.3d 295, 301 (2d Cir.1996) (party claiming promissory estoppel must prove a "clear and unambiguous" promise.)

Rosario's immunity claim can only be considered in the context of a long and complex chronology. To reconstruct that chronology, the court must first resolve credibility disputes among various testifying witnesses.

### A. *Witness Credibility*

Nine witnesses testified at the remand hearing before this court: (1) defendant Francisco Rosario; (2) Brian Welsome and (3) Charles Hochbaum, attorneys retained by the Police Benevolent Association ("PBA") to represent Rosario; (4) George Cerrone and (5) John Patten, attorneys who represented various police sergeants in connection with the same investigation; (6) Sgt. James Yee, Rosario's former supervisor; (7) Edward Jenks, an attorney who for a time represented Rosario's partner Rolando Aleman; and (8) Catherine Palmer and (9) Kenneth Thompson, former Assistant U.S. Attorneys who participated in the Louima investigation. The court listened carefully to each witness's hearing testimony and took particular note of demeanor, both on direct and cross-examination. It considered the opportunity each witness had to observe the events at issue, the witness's ability to recall these events accurately, the witness's motives in testifying, as well as any evidence in the record corroborating or impeaching the witness's account.

The court finds that Francisco Rosario was generally not a credible witness. His testimony was often inconsistent, particularly with respect to who and what he saw in the processing room of the 70th precinct on August 9, 1997, and his reasons for believing he had been granted immunity in November 1997 for lies told in September of that same year. Although the court occasionally intervened to encourage Rosario to clarify his answers, these efforts were usually abandoned because defendant's explanations were frequently incoherent or implausible. Further troubling was Rosario's demeanor, which was obviously studied on direct examination but frequently evasive on cross-examination. Mindful that evidence at Rosario's criminal trial indicated a past learning disability, the court has considered whether this factor somehow mitigates the problems identified. The court concludes that it does not; Rosario was often evasive at the hearing but he did not appear confused. In evaluating Rosario's testimony, the court further notes that as the convicted defen-

dant in the case, Rosario had a unique interest in tailoring his testimony to suit his immunity claim. Moreover, it recognizes that on more than one occasion in 1997, this former police officer, whose sworn duty it was to uphold the law, deliberately lied to local and federal authorities whom he knew were engaged in an important criminal investigation.

By contrast, the court finds former Assistant U.S. Attorney Catherine Palmer to have been the most credible witness at the hearing and by far the most reliable reporter of the relevant events. Contrary to defendant's dismissive characterization of Ms. Palmer's testimony as "ridiculous," "fanciful," and "facially absurd," the court finds her account to have been coherent, logical, and entirely convincing. Her demeanor was impressively straightforward and thoroughly professional.

To the extent the court credits aspects of Ms. Palmer's testimony over that of her former colleague Kenneth Thompson, it is not because the court questions Mr. Thompson's veracity. Rather, occasional errors in Mr. Thompson's recollection, for example, with respect to the sequence of events at an October 30, 1997 meeting with Sgt. Yee, suggest that Ms. Palmer's memory is generally more reliable.

Also, insofar as their testimony differs, the court credits Ms. Palmer over Rosario's former counsel, Charles Hochbaum. On more than one occasion, the hearing revealed Mr. Hochbaum's recollection of important facts to be flawed, as, for example, when he erroneously placed former Assistant U.S. Attorney Loretta Lynch at the critical November 20, 1997 interview where Rosario purportedly received immunity, or when he testified that photographs were displayed to Rosario at that meeting. Further, Mr. Hochbaum's demeanor at the hearing was, on occasion, more that of an advocate than a witness, particularly in his reluctance to answer questions that could undermine his former client's hearing claims.

As for Mr. Welsome, Mr. Cerrone, and Mr. Patten, it appeared to this court that past professional disputes with the prosecutors in this case may have adversely influenced their recollection of events. In a different vein, Mr. Jenks's poor recollection of certain facts relating to his representation of Officer Aleman, and Sgt. Yee's obvious reluctance as a witness, required the court to weigh their testimony with some care.

In light of these general credibility findings, the court now reviews the circumstances relevant to Rosario's immunity claim.

### B. Rosario Lies to the Internal Affairs Bureau in August 1997

As part of the initial investigation into the Louima assault, members of the New York City Police Department Internal Affairs Bureau ("IAB") endeavored to interview every officer present at the 70th precinct on the night of the brutal incident. Although defendant Francisco Rosario and his partner Rolando Aleman were not assigned to the 70th precinct, they happened to be at that location on August 9, 1997 processing an unrelated arrest. In fact, it is now undisputed that Rosario and Aleman were in the precinct's first floor processing room completing arrest paperwork when a police officer brought the injured Louima into that room and placed him in a holding cell. Identifying that officer was a critical early goal of the investigation since Louima was brought to the cell area directly from the bathroom where he had been sodomized. Although Rosario and Aleman both saw the officer put Louima into a holding cell, they deliberately decided not to cooperate with IAB. When questioned by investigators in August 1997, both men, represented by Brian Welsome,

falsely denied being in the processing room at the relevant time.

## C. *Rosario Lies to Federal Authorities on September 22, 1997*

Sometime in August 1997, federal authorities took over the Louima investigation. On September 22, 1997, they interviewed Rosario, who was still represented by Mr. Welsome. Once again, Rosario falsely stated that he was not in the 70th precinct processing room when Louima was placed in the holding cell. At or about the same time, Aleman similarly lied to federal authorities.

## D. *Aleman Is Subpoenaed to the Grand Jury*

In October 1997, Aleman was subpoenaed to appear before a federal grand jury investigating the Louima assault. Approximately a week prior to this appearance, Aleman and Mr. Welsome voluntarily met with Assistant U.S. Attorneys Catherine Palmer and Kenneth Thompson, as well as agents of the FBI, to review Aleman's anticipated testimony. Persisting in his previous lies, Aleman insisted that neither he nor Rosario was in the processing room when Louima was put in a holding cell. He falsely stated that both officers were on the second floor arranging for their prisoner, Tim Matthews, to be interviewed by detectives.

Over the next few days, federal authorities came to suspect Aleman's story. Specifically, when Tim Matthews was questioned, he stated that his two arresting officers were in the processing room when Abner Louima was brought there. Two other prisoners at the 70th precinct on August 9, 1997, Patrick Antoine and Connelle Lugg, also recalled seeing plainclothes officers in the cell area when Louima was brought in. Aleman and Rosario were the only plainclothes officers in the 70th precinct at that time.

On the day Aleman was to testify in the grand jury, prosecutors confronted him and Mr. Welsome with these facts and cautioned Aleman about committing perjury. Aleman did not dispute the Matthews/Antoine/Lugg account of his whereabouts on August 9, 1997. Rather, he angrily professed that he was not a "rat," told prosecutors that they could not adequately protect him from violent retaliation, and stormed out of the meeting.

Aleman never testified before the grand jury. Like Rosario, he was indicted for making false statements to investigating authorities. Unlike Rosario, however, Aleman pleaded guilty to violating 18 U.S.C. § 1001 and was sentenced by Judge Nickerson to two years' probation.

## E. *The Palmer/Welsome Telephone Conversation*

In the weeks between the aborted Aleman meeting and Rosario's November 20, 1997 interview, Assistant U.S. Attorney Catherine Palmer spoke with four lawyers who now testify in support of Rosario's claim that he was granted or promised transactional immunity for his September 22, 1997 lies. The first of these lawyers was Brian Welsome.

Ms. Palmer testified that in October 1997, she had several telephone conversations with Mr. Welsome in which she voiced concern that Rosario and Aleman might lie in the grand jury and that counsel had a conflict representing both officers. Mr. Welsome took exception to the conflict point, but told Ms. Palmer that his clients might be able to provide the authorities with additional information. Indeed, he volunteered that he had advised Rosario and Aleman to tell the authorities anything they knew "as long as what they were coming in to tell [prosecutors] was what was already in the public record."

Tr. at 245.[4] Aware of news reports attributing self-serving statements about the Louima assault to four recently indicted police officers (Justin Volpe, Charles Schwarz, Thomas Bruder, and Thomas Wiese), Ms. Palmer stressed to Mr. Welsome that Aleman and Rosario needed to tell federal authorities the whole truth, not just repeat publicly known facts.

In testifying about these conversations at the hearing, Mr. Welsome claimed that Ms. Palmer offered to "go to bat" for Rosario and Aleman with the New York City Police Department if the officers told federal authorities the truth. While she could not promise that his clients would keep their jobs, she noted that the Police Department was generally following the suggestions of the U.S. Attorney's office with respect to the Louima case. From this conversation, Mr. Welsome testified, he inferred that Ms. Palmer would grant the officers immunity, since they could hardly resume their police careers if they were being prosecuted federally. He testified that he reported his conversation and the inference he drew from it to Aleman, whom he assumed told Rosario.

The court does not find Mr. Welsome credible on this point. First, it doubts that any experienced defense lawyer would equate an offer to "go to bat" with the Police Department with a promise of transactional immunity from prosecution, certainly not without further inquiry and assurance. Experienced attorneys know that prosecutors frequently do not indict cooperating witnesses for past false statements, but rarely do they confer immunity on them. Rather, prosecutorial options are deliberately kept open, at least until the witness has finished cooperating and often until the statute of limitations has run its course. Thus, Ms. Palmer's purported offer to "go to bat" for the officers' jobs would not constitute the sort of "clear and unambiguous" promise of transactional immunity necessary to support promissory estoppel. *See* Restatement (Second) of Contracts § 90 (identifying three elements of promissory estoppel: (1) a clear and unambiguous promise, (2) reasonable and foreseeable reliance by the party to whom the promise is made, and (3) an injury sustained as a result of the detrimental reliance); *Arcadian Phosphates, Inc. v. Arcadian Corp.,* 884 F.2d 69, 73 (2d Cir.1989) (same).

Further, the court specifically credits Ms. Palmer's testimony that she did *not* tell Mr. Welsome that she would assist Aleman and Rosario with the Police Department. In October 1997, Catherine Palmer was one of the most experienced Assistant U.S. Attorneys in the Eastern District of New York. A veteran of many complex investigations and trials, *see e.g., United States v. Wong,* 40 F.3d 1347 (2d Cir.1994); *United States v. Eng,* 14 F.3d 165 (2d Cir.1994),[5] she enjoyed a well-deserved reputation for careful preparation of her cases and tenacious advocacy.[6] Ms. Palmer testified that while supervising the federal investigation into the Louima assault, she routinely confronted a "blue wall of silence" erected by police officers and PBA officials intent on obstructing efforts to uncover the full truth about what had happened at the 70th precinct on August 9, 1997.[7] With a sensitive brutality

---

**4.** "Tr. at ___" refers to the transcript of the May 28–29, 2002 hearing.

**5.** Both the *Wong* and *Eng* cases were tried before this judge.

**6.** Ms. Palmer's refusal to work with a defendant whom she considered an untrustworthy informant led to the man's notorious attempt to assassinate her with a spring gun concealed in a "gift" briefcase. *See United States v. Kwong,* 69 F.3d 663 (2d Cir.1995); *United States v. Kwong,* 14 F.3d 189 (2d Cir.1994).

**7.** This court gained some insight into this phenomenon a few months later when it denied motions by PBA officials to quash grand jury subpoenas. *See In re Grand Jury Subpoe-*

investigation thus rapidly expanding into a disturbing obstruction case, she was hardly inclined to promise assistance, much less to offer immunity, to officers such as Aleman and Rosario, who had already lied once to federal officials and who appeared willing to lie again to a federal grand jury. Further, as Ms. Palmer explained, she would not have made such an offer through Mr. Welsome, a lawyer who was not only oblivious to his own conflict, but who was actively counseling his clients to limit what they told federal authorities to something less than the whole truth. In sum, the court credits Ms. Palmer's testimony that in October 1997 she was not interested in negotiating with Mr. Welsome; she was interested in having him replaced.

### F. The Palmer/Cerrone Conversation

Toward this end, Ms. Palmer spoke with Marshall Trager, the attorney responsible for PBA assignments of counsel to police officers, as well as with George Cerrone, who performed the same task for police sergeants. Mr. Cerrone, who also represented Sgt. James Yee, Rosario and Aleman's supervisor, was the second attorney to testify in support of Rosario's immunity claim.

Mr. Cerrone stated that on October 30, 1997, after prosecutors interviewed Sgt. Yee, Ms. Palmer privately asked counsel if Yee would carry a message to Rosario and Aleman: come in and tell the truth and receive a "pass" on prior false statements. Mr. Cerrone explained that he interpreted a "pass" to mean that the officers would not be prosecuted if they told the truth. Initially Yee was reluctant to become involved but, ultimately, with Mr. Cerrone's

encouragement, the sergeant agreed to convey the message.

Although Mr. Cerrone's testimony was corroborated in part by his co-counsel, Mr. Patten, who recalled a brief conversation in which Ms. Palmer stated that the officers would not be prosecuted if they told the truth, the court rejects this testimony for several reasons.

First, it was contradicted not only by the prosecutors, Ms. Palmer and Mr. Thompson, but by Mr. Cerrone's own client, Sgt. Yee. Consistent with the prosecutors' accounts, Yee testified that what Ms. Palmer asked him to communicate to Rosario and Aleman was the importance of telling the truth before the grand jury. She made no promises of benefits or assistance if they did so, and, as a result, Yee communicated none to Rosario. What Yee did tell Rosario, who was preoccupied with his job, was that Yee would rather see the officer lose his job than his freedom, the likely outcome if Rosario committed perjury in the grand jury. Despite this admonition, Rosario persisted in lying to his superior officer, telling Yee that he and Aleman were not in the processing room when Louima was put in the holding cell.

Rosario provided a different version of this meeting, testifying that Yee assured him that if he told prosecutors the truth, nothing would happen to him. Rosario said he understood this to mean that he would not be charged with any crimes. Rosario also testified that Yee told him federal authorities would help him keep his job in the Police Department. The latter statement is revealing, not only because Yee denied making it, but because neither Mr. Cerrone nor Mr. Patten ascribed such a promise to Ms. Palmer. They testified

*nas Dated January 20, 1998,* 995 F.Supp. 332 (E.D.N.Y.1998). The problem was also noted by the Court of Appeals in *United States v. Schwarz,* 283 F.3d 76, 106 (2d Cir.2002) (alluding to evidence that certain police officers "agreed generally to impede investigators [in the Louima case] by putting forth and corroborating a false version of what occurred.")

that she specifically stated that she could *not* make any promises about the officers' jobs. The discrepancy, particularly when viewed through the prism of Rosario's unconvincing demeanor on the stand, suggests a defendant more eager to help his case than to tell the truth.

Returning to Mr. Cerrone's claim that Ms. Palmer promised Rosario a "pass" in return for the truth, a second reason for rejecting this account is Ms. Palmer's credible explanation that even if she had been inclined to offer Rosario immunity—which she was not, for reasons already discussed—she would not have communicated this offer to Mr. Cerrone who, after all, did not represent Rosario, or through a non-lawyer such as Sgt. Yee. This makes sense because such an offer would inevitably lead to questions about the scope of the coverage being proposed, which Sgt. Yee could not begin to answer. In fact, the court seriously doubts that an experienced attorney such as Mr. Cerrone would have allowed Sgt. Yee to carry such a legally complex message, by contrast to the simple admonition to tell the truth in the grand jury that Sgt. Yee actually conveyed.

Finally, in testifying before this court, Mr. Cerrone and Mr. Patten both demonstrated a certain bias against Ms. Palmer stemming from her decision to prosecute another one of their clients, Sgt. Michael Bellomo, for alleged misconduct in connection with the Louima investigation.[8] Both attorneys testified that after Sgt. Bellomo was indicted, they confronted Ms. Palmer and demanded to know why she had not given Bellomo the same opportunity to avoid prosecution that she had afforded Rosario and Aleman. Mr. Cerrone testified that Ms. Palmer had no satisfactory response. Refusing to look him in the eye, she gazed at the floor, stating only, "I

believe in my case; I believe in my case." Tr. at 64. No one who has ever dealt professionally with Ms. Palmer, indeed, no one who saw her testify at the hearing in this case, would credit such an account of her behavior. Her manner is simply too forthright. The court rejects Mr. Cerrone's testimony with respect to this encounter, as well as his testimony that Ms. Palmer offered Rosario immunity on October 30, 1997.

### G. *The Palmer/Hochbaum Conversations*

The fourth lawyer to testify in support of Rosario's immunity claim was Charles Hochbaum. Retained by the PBA to replace Mr. Welsome as Rosario's counsel, Mr. Hochbaum spoke by telephone with Ms. Palmer on at least two occasions in November 1997. Although he could not recall the specifics of each conversation, Mr. Hochbaum testified that in substance Ms. Palmer told him that Rosario had not been truthful in his previous interview, that she was not looking to hurt Rosario now, and that she simply wanted him to tell the truth. Toward that end, she offered to intervene with the Police Department to try to save Rosario's job if he now told federal authorities the truth.

To corroborate this testimony, Rosario offers Mr. Hochbaum's contemporaneous notes, two handwritten pages that purportedly reflect telephone conversations with both Marshall Trager and Ms. Palmer. Mr. Hochbaum testified that the portion of the notes relating to his conversation with Ms. Palmer reads as follows:

> Know that they haven't told Feds the truth
>
> Problem w/telling IAB a different story—now worried about their jobs -

---

8. Bellomo, who would stand trial with Officers Volpe, Schwarz, Bruder and Wiese, was acquitted of the charges against him. *See United States v. Volpe,* 98 CR 196(EHN).

US Atty's office will go to bat for them with Police Dept.

But, if don't tell truth will indict for perjury -

Meet with cops— & then prep for.

Defense Hearing Ex. 1.

Insofar as Rosario invokes promissory estoppel, the court observes that neither Mr. Hochbaum's testimony nor his notes indicate that Ms. Palmer clearly and unambiguously promised Rosario transactional immunity in return for his telling the truth. Mr. Hochbaum, like Mr. Welsome, simply assumed from Ms. Palmer's purported offer of job assistance that she would grant transactional immunity for prior false statements. For the reasons already stated in rejecting Mr. Welsome's testimony on this point, the court finds that no experienced defense lawyer would make this assumption.

In any event, the court credits Ms. Palmer's testimony that she did not tell Mr. Hochbaum that she would help Rosario keep his job as a police officer. To the extent the defense relies on Mr. Hochbaum's notes to corroborate his testimony, the hearing raised questions about the circumstances under which counsel took these notes. For example, the entry immediately preceding the purported promise to "go to bat" references a "problem" with Rosario and Aleman "telling IAB a different story." Ms. Palmer, however, testified that she recalled no telephone discussion with Mr. Hochbaum about the officers' IAB statements. Indeed, she did not think she had seen these statements in November 1997. While candidly acknowledging that her recollection on this point was not as precise as on other matters, Ms. Palmer explained that a "Chinese Wall" had been erected in her office to shield her from IAB reports in light of a legal question as to whether evidence derived from IAB interviews could be used in a federal prosecution. In sum, the possibility exists that Mr. Hochbaum may be mistaken in attributing portions of his notes to a conversation with Ms. Palmer. As already noted, his recollection of other key events was occasionally inaccurate, specifically, his placement of Assistant U.S. Attorney Loretta Lynch at the critical November 20, 1997 interview. In light of the totality of these circumstances, the court gives little weight to Mr. Hochbaum's notes. Instead, it focuses on the testimony given by the witnesses in court.

With a clearer and more detailed recollection than Mr. Hochbaum, Ms. Palmer testified that after new counsel were retained for Rosario and Aleman, she spoke with the attorneys by telephone and told them that their clients, both of whom had already lied to the authorities about their presence in the 70th precinct processing room on August 9, 1997, would soon be questioned about these events in front of a grand jury. She testified that her focus at that point was not on the officers' past false statements; it was on possible future falsehoods. This testimony is credible because, as Ms. Palmer explained, she viewed perjury before a grand jury as a particularly serious and indefensible crime.

In attempting to impeach Ms. Palmer's claim that her concern was future perjury, the defense suggested that it would have been unethical for her to have put Rosario and Aleman in the grand jury if she believed they were lying. As the court observed, such an ethical concern arises only if a prosecutor presents lying witnesses' testimony as if it were true, which was never Ms. Palmer's intent. Similarly unconvincing was the argument that Ms. Palmer could have readily assuaged her concern about perjury by simply withdrawing the officers' subpoenas. As is well established, the grand jury is entitled to every person's evidence, *see, e.g., United States v. Dionisio*, 410 U.S. 1, 9–10, 93

S.Ct. 764, 35 L.Ed.2d 67 (1973); *Kastigar v. United States,* 406 U.S. 441, 443–44, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), and this principle may not be defeated by calling for the withdrawal of a subpoena whenever a reluctant witness threatens perjury.

Ms. Palmer testified that after Rosario and Aleman were formally subpoenaed, both their lawyers contacted her to request meetings at which their clients proposed to make further disclosures to the authorities. Mr. Hochbaum candidly acknowledged that he would not have sought this meeting but for the grand jury subpoena. While Rosario did have a constitutional right to refuse to answer questions in the grand jury, neither Mr. Hochbaum nor his client considered this a realistic option if Rosario wanted to remain a New York City Police officer.[9] Thus, when Rosario met with prosecutors on November 20, 1997, it appears that the defense focus, no less than the prosecution's, was on ensuring against future perjury, not on bargaining about the consequences of past falsehoods.

For all these reasons, the court concludes from the credible evidence adduced at the hearing that the parties reached no immunity agreement in November 1997 and, further, that the prosecution never made a clear and unambiguous promise of immunity on which Rosario reasonably relied to his detriment.

## II. *Prosecutors to Decide Rosario's Truthfulness*

 Having rejected Rosario's immunity claim, further fact-finding on this remand may be unnecessary. Nevertheless, a full hearing having been conducted, the court, in an abundance of caution, address-

es the remaining points in dispute, starting with what the Court of Appeals identified as a potentially "critical factual element of the alleged agreement," the question of "who determines Rosario's truthfulness." *United States v. Aleman,* 286 F.3d at 92.

Rosario acknowledges that when immunity agreements are reduced to writing in the Eastern District of New York, they invariably provide for prosecutors to determine if a truth-telling condition has been satisfied. Because his alleged immunity agreement was oral, however, and because the prosecution failed expressly to reserve to itself in words or writing the right to determine truthfulness, Rosario contends that this term of his agreement is ambiguous and must be resolved against the government. *See id.* at 90. He submits that this court is the proper party to decide whether he satisfied the truth-telling condition of his agreement.

Preliminarily, the court observes, for reasons addressed in Point I, that the prosecution's failure expressly to reserve the right to determine if Rosario told the truth on November 20, 1997 is not evidence that it "made a poor bargain" in this case, *id.* at 91, but merely a function of it having made no bargain at all.

Even if Rosario had been able to prove the existence of the alleged immunity promise or agreement, however, his own testimony shows that there was no ambiguity between the parties as to who would decide his truthfulness. Rosario well understood that this determination would be made by the prosecutors.

Q. [D]id you assume that you were going to have to convince Cathy Palmer that you were telling the truth?

Mr. Hochbaum was giving Rosario but with the actual state of mind of counsel and client insofar as it sheds light on the issues in dispute at this hearing.

---

9. Although present counsel suggest that grand jury secrecy would have shielded Rosario's invocation of Fifth Amendment rights from the officer's police superiors, this court's concern is not with the accuracy of the advice

A. Did I believe I had to convince her? I knew that I had to go in there and tell the truth and that's what I did.

Q. Did you believe that Cathy Palmer had to agree with you that you were telling the truth in that interview on November 20, 1997.

A. Yeah, yeah.

Tr. at 94. Further, in responding to questions from the court, Rosario testified that once Ms. Palmer decided she did not believe him, he knew he could not expect any benefits or assistance from federal authorities.

THE COURT: Now, when the meeting was over, you understood that the prosecutors did not believe you, correct?

THE WITNESS: Yes.

THE COURT: What did you understand that meant for the agreement that you walked in with?

THE WITNESS: That I guess all bets were off.

THE COURT: Because they did not believe you?

THE WITNESS: Right.

*Id.* at 121.

In an obvious effort to help his former client's case, Mr. Hochbaum implausibly claimed that he had no understanding as to who would decide if Rosario was telling the truth on November 20, 1997. *See id.* at 21, 50. Mr. Hochbaum is simply too experienced a defense attorney for this to be credible. At another point he professed that it never "crossed [his] mind" that "anyone" would want to "evaluate" Rosario's truthfulness, *id.* at 47, a highly improbable assertion when a client has already lied to federal authorities. Still elsewhere, Mr. Hochbaum suggested that there was no need for anyone to evaluate Rosario's truthfulness since Ms. Palmer already knew the truth, and Rosario was simply going to confirm it. *See id.* at 25–26. The suggestion that Rosario's truth-telling obligations could be satisfied simply by con-firming facts already known to federal authorities bears a disturbing resemblance to Mr. Welsome's advice that his clients limit disclosures to facts already publicly known. In any event, implicit in Mr. Hochbaum's statement that Ms. Palmer knew the truth is the expectation that Rosario's interview account would have to satisfy her. Eventually, albeit with great reluctance, Mr. Hochbaum did testify that, in hindsight, it "makes a lot of sense" that Ms. Palmer or her supervisors would decide if Rosario told the truth. *Id.* at 46. Counsel's tortured effort to avoid this conclusion—which was apparent even to his client, not to mention the other defense attorneys who testified at the hearing—only reinforces this court's finding that Rosario always understood that federal prosecutors, not this court and not any third party, would decide if he told the truth at his November 20, 1997 interview.

III. *The Government's Good Faith Determination that Rosario Lied on November 20, 1997*

■ Had Rosario been able to prove the existence of an immunity agreement, the government would have the burden of showing that defendant's failure to tell the truth absolved it from its contractual obligations. *See United States v. Lukse,* 286 F.3d 906, 909 (6th Cir.2002); *United States v. Castaneda,* 162 F.3d 832, 836 (5th Cir. 1998); *United States v. Tilley,* 964 F.2d 66, 71 (1st Cir.1992); *United States v. Verrusio,* 803 F.2d 885, 888 (7th Cir.1986).

Where satisfaction of a truth-telling condition is reserved to the prosecution, however, court review is generally deferential, less concerned with whether a prosecutor's dissatisfaction is reasonable than with whether it is honestly conceived. *See United States v. Knights,* 968 F.2d 1483, 1487 (2d Cir.1992) (citing *United States v. Rexach,* 896 F.2d 710, 713 (2d Cir.1990) and Restatement (Second) of Contracts

§ 228, cmt. a (1981)). The critical question is whether the prosecution's decision was reached in "good faith." *See United States v. Aleman*, 286 F.3d at 90 (citing *United States v. Khan*, 920 F.2d 1100, 1105 (2d Cir.1990)).

In considering the issue of good faith, the court begins by summarizing Rosario's statement at the November 20, 1997 interview. Once again, Ms. Palmer provided the most reliable and detailed account. She testified that soon after the meeting began, Rosario admitted that he had not been truthful with federal authorities in the past for fear of repercussions on the job. Ms. Palmer told Rosario that he was in a lot of trouble, that his job was the least of his concerns, and that he should simply tell the truth.

Rosario then stated that in the early morning hours of August 9, 1997, he was on the second floor of the 70th precinct where detectives were interviewing his prisoner. Eventually, he grew bored and went to the first-floor cell area to fill out arrest paperwork. While there, he saw a black male prisoner brought into the cells by a police officer. Rosario provided a physical description of the prisoner, whom prosecutors had already identified as Patrick Antoine, but insisted that he could not provide any description of the accompanying police officer. A short while later, Rosario saw another prisoner, whom he later learned was Abner Louima, brought into the cells by another officer. Rosario did not identify this officer by name, but said he remembered seeing his picture in the newspapers and recalled that he was wearing a toupee. From this description, prosecutors assumed Rosario was referring to Thomas Bruder.

Based on other evidence developed in the investigation, prosecutors were skeptical of Rosario's identification. They asked if he had seen Officer Justin Volpe in the cell area any time that night. Rosario unhesitatingly and unequivocally stated that he had not, emphasizing that he knew Volpe, would have recognized him and, for that reason, was certain that Volpe was not the officer who accompanied Louima to the cells. Rosario was equally emphatic in asserting that his partner Aleman was not in the cell area during this time.

Rosario did state that after Louima was placed in the cells, a foul odor permeated the area. As a result, Rosario left the processing room and went to the front of the precinct house where he encountered Aleman and Sgt. Yee. Rosario insisted that he told Yee of his concerns about Louima's condition.

After Rosario finished his account, federal authorities asked him numerous questions, returning frequently to the critical period between 4:30 and 5:00 a.m. At the close of the interview, they told Rosario that they did not think he had been truthful and that if he repeated his statements in the grand jury, he would be committing perjury.

Rosario contends that the prosecutors' conclusion that he was untruthful on November 20, 1997 was not reached in good faith. He submits that the real reason they rejected his account was because it failed to support their preferred prosecution theory, i.e., that Justin Volpe brought Louima to the holding cell on August 9, 1997.

In *United States v. Aleman*, 286 F.3d at 90, the Court of Appeals observed that prosecutors may not abandon an immunity agreement "simply because the defendant is supplying information that the government does not want to hear" (quoting *United States v. Khan*, 920 F.2d 1100, 1105 (2d Cir.1990)). There must be some good faith reason to support their belief that the information is untruthful. *See United States v. Knights*, 968 F.2d at 1488–89 (holding that where record is devoid of "a finding, or evidence, or even a claim" that

defendant's account was untruthful, mere inconsistency between his version of events and the testimony of another witness will not support abandonment of a cooperation agreement; case remanded for further findings).

Having conducted a full hearing, this court finds that the prosecutors did not reject Rosario's November 20, 1997 statement simply because it was not what they wished to hear. Rather, the court is convinced from the detailed, specific, and credible evidence cited by Ms. Palmer that prosecutors honestly believed Rosario was still lying to them.

First, as Ms. Palmer noted, the desk where Rosario was seated in the processing room was only four feet from the cell area. Given this proximity, it was hardly credible that Rosario could provide no description whatsoever of the officer who placed Patrick Antoine in a cell. Concededly, the event may not have seemed important at the time; nevertheless, Rosario took some note of what was transpiring before him as evidenced by his description of Antoine. Further, by November 20, 1997, Ms. Palmer knew from other sources that Antoine was probably transported to the holding cells by either Officer Daly or Officer O'Brien, two additional clients of Brian Welsome. This coincidence heightened her suspicion that Rosario was deliberately seeking to avoid implicating these officers in the events of August 9, 1997.

Second, Ms. Palmer was justifiably skeptical of the vehemence with which Rosario insisted that he had not seen Justin Volpe in the cell area. At that point in the investigation, five witnesses had placed Volpe in or right outside the cell area at the relevant time: Louima himself, Patrick Antoine, Connelle Lugg, Tim Matthews, and Police Officer Eric Turetzky. Although defense counsel submits that these witnesses' accounts are suspect and that

their identification of Volpe is the product of prosecutorial importuning, the court categorically rejects this argument. The court has carefully reviewed the prior trial testimony of these witnesses, both on direct and cross-examination. In the case of Louima, Antoine, and Turetzky, it had the opportunity at the recent retrial of Charles Schwarz to see them testify in person and to hear their accounts challenged by extremely able defense counsel. *See United States v. Schwarz*, 98 CR 196(EHN) (charging violations of Abner Louima's civil rights), *remanded pursuant to United States v. Schwarz*, 283 F.3d 76, *consolidated with United States v. Schwarz*, 02 CR 366(RR) (charging perjury at prior obstruction trial). Notably, it listened to tape recorded interviews with Turetzky and Louima, which defense counsel submits impeaches their credibility. The court does not draw from these tapes the inferences urged by defense counsel. To the contrary, it finds the identification of Volpe by these three witnesses fully credible, and it has no doubt that the prosecution honestly did so as well. *See generally United States v. Knights*, 968 F.2d at 1488 (recognizing district court's unique ability to evaluate credibility where it personally hears the witness's trial testimony).

A third factor reasonably leading Ms. Palmer to conclude that Rosario was not telling the truth was her knowledge that defendant's placement of Thomas Bruder, or someone who looked like him, in the holding cell with Louima followed closely on the publication of a magazine interview with Bruder in which he put himself in that very location. Defense counsel notes that in the magazine article, Bruder assigned himself the more favorable role of a Good Samaritan who entered the cells after Louima was already there to help pull up the prisoner's pants and locate his shoes. Despite this discrepancy, it was certainly reasonable for Ms. Palmer to weigh Rosario's identification in light of

Mr. Welsome's earlier admonition to his client: disclose only what is already in the public record. Rosario appeared to be doing just that, putting someone in the cell area who had publicly acknowledged being there some time on August 9, 1997. Indeed, by insisting that Volpe was not in the cell area with Louima, and by instead placing Bruder at that place on the right day but at the wrong time, Rosario may well have hoped to present himself as a person so confused about the sequence of events on August 9, 1997, that he could ensure his main goal: not being called as a prosecution witness in the trial of any fellow police officer.

Ms. Palmer's belief that Rosario deliberately lied in his November interview was reinforced two days later when she spoke with Aleman.[10] Whereas Rosario had insisted that his partner was never in the cell area when Antoine and Louima were brought there, Aleman now admitted that he too was present. At the same time, however, Aleman's statements with respect to Volpe, Schwarz, Bruder, and Wiese also seemed highly suspect to Ms. Palmer, particularly insofar as they repeated even more facts mentioned in the aforementioned magazine piece.

Not insignificant to the issue of prosecutorial good faith, Ms. Palmer testified that she did not view any of these factors in isolation. Rather, she considered them as a whole, mindful of Rosario's and Aleman's strong interest in avoiding involvement in the investigation. Further, in weighing Rosario's November statements against the contrary evidence she had developed, Ms. Palmer was entitled to consider the fact that this officer had already lied to authorities in connection with the Louima investigation.

From the totality of these circumstance, the court finds that the prosecutors did not reject Rosario's testimony as untruthful simply because it was inconsistent with their theory of the case. They deemed it untruthful because they honestly and in good faith believed that Rosario was still deliberately lying to them.

IV. *The Court Finds that Rosario Was Deliberately Untruthful on November 20, 1997*

▆ To the extent Rosario urges this court to decide if he told the truth on November 20, 1997, the court finds that he did not.[11] In reaching this conclusion, the

---

10. The court notes that Edward Jenks, who represented Aleman at this meeting, testified that no promises of transactional immunity were made to Aleman in connection with this interview. Defense counsel sought to impeach Mr. Jenks with a prior statement in which he suggested that his client's November meeting was pursuant to a "proffer agreement." Plainly, there is a significant difference between the use immunity conferred by a proffer agreement and the transactional immunity Rosario claims. In any event, the court credits Mr. Jenks's explanation that he was mistaken about Aleman having a proffer agreement. It accepts the testimony of Ms. Palmer and Mr. Thompson that there was no use immunity agreement with Aleman and no transactional immunity agreement with Rosario.

11. In its remand order, the Circuit cautioned that this court should "avoid deciding the general issue of Rosario's criminal liability, which may prove impossible in this case, because the potential issue of Rosario's truthfulness directly implicates his guilt." *United States v. Aleman*, 286 F.3d at 92. The court endeavors to heed this admonition. Certainly, it recognizes the line of cases that urge against pre-trial consideration of issues that implicate a defendant's guilt. *See, e.g., United States v. Doe*, 63 F.3d 121, 125 (2d Cir.1995) (cited in *United States v. Aleman*, 286 F.3d at 92). In this case, however, a jury has now found Rosario not guilty of making false statements to federal authorities on November 20, 1997, and no finding by this court can alter that verdict. Nevertheless, it is well recognized that in appropriate circumstances a court may consider the conduct underlying

court relies on the same factors that influenced the prosecution, discussed in Point III, *supra*. Two factors unknown to the prosecution in November 1997 further support the court's conclusion: (1) Justin Volpe's admission that he was indeed the officer who accompanied Louima to the holding cell, and (2) Rosario's lack of candor at the remand hearing.

Midway through his own trial, Justin Volpe pleaded guilty to sodomizing Abner Louima on August 9, 1997 in violation of his constitutionally protected civil rights. Called as a defense witness at subsequent trials arising from the Louima investigation, Volpe specifically admitted that he was the officer who took Louima from the bathroom to the processing room and placed him in a holding cell. Because Rosario was only four feet away from the holding cells when Volpe and Louima entered the processing room, and because he knew Volpe and, therefore, would easily have recognized him, the court finds that Rosario was deliberately untruthful on November 20, 1997 when he insisted that he never saw Volpe in the cell area.

. Perhaps mindful of the implausibility of his categorical November 1997 denial, Rosario shifted position at his trial and told the jury that the escorting officer "might" have been Volpe since Rosario had only seen that officer from the rear. Before this court, however, the defense shifts positions again. Counsel does not argue that Rosario may have been honestly mistaken in his November 20, 1997 identification of Bruder rather than Volpe as the officer who put Louima in the holding cell. Rather, the defense submits that Volpe's admission is itself suspect because, as the prosecution has argued at various trials, Volpe is concealing or minimizing the involvement of his confederates in the Louima assault.

The court totally rejects this defense argument. At the recent Schwarz retrial, the court heard Volpe testify and saw him vigorously impeached. While there is every reason to think that Volpe is still concealing the identity of other officers who participated with him in the bathroom assault of Abner Louima, the court is convinced beyond any reasonable doubt that it was Volpe who put Louima in the holding cell. As already noted, on this point, Volpe is corroborated by five eyewitnesses, three of whom—Louima, Antoine, and Officer Turetzky—the court heard testify and fully believes.

As for Rosario's own credibility, the court has already discussed its general concerns. Certainly, he was not credible in his vague account of the November 20, 1997 meeting with prosecutors. His report of a twenty-minute meeting ending abruptly when he refused to implicate Justin Volpe simply did not ring true. The court credits the prosecutors' recollection of a meeting lasting almost two hours in which material was reviewed several times to afford Rosario every opportunity to give a complete account. More troubling, however, was Rosario's feeble effort to reconcile his June 2000 trial testimony that Volpe "might" have put Louima in the cell with his November 1997 statement that he was certain it was not Volpe. *See* Tr. at 101–08. Although Rosario acknowledged the latter statement at his trial, at the hearing he professed that he "didn't recall exactly" what he had told the prosecutors on this crucial point. *Id.* at 107. The prosecutors, however, did remember. As already noted, it was precisely Rosario's

---

acquitted charges when that conduct is proved by a preponderance of the evidence. *See United States v. Watts,* 519 U.S. 148, 157, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997); *ac-* *cord United States v. SKW Metals & Alloys, Inc.,* 195 F.3d 83, 92 (2d Cir.1999). The court assumes that it may do the same here.

vehemence on this crucial fact that led them to question his truthfulness. In fact, the prosecutors' recollection finds some support in Mr. Hochbaum's testimony. He stated that before the November 1997 interview, his client told him that the officer who brought Louima to the cell "wasn't Justin Volpe...I don't think he knew for sure who it was...(but) he did say to me that he knew it wasn't Volpe because he met Volpe before." *Id.* at 48. The court does not believe Rosario's testimony that he cannot recall what he told prosecutors in November 1997 about Justin Volpe. It finds that on this and many other points throughout the hearing, Rosario was deliberately evasive and untruthful, and that his specific purpose was to obfuscate the fact that he was also deliberately untruthful at his November 20, 1997 interview when he insisted that Justin Volpe was not the officer who brought Abner Louima to the holding cell.

In sum, even if Rosario had proved the existence of an immunity agreement or promise and even if this court rather than the prosecution were the proper party to decide if he had satisfied the truth-telling condition of that agreement, Rosario would not be entitled to immunity for lies told on September 22, 1997, because this court finds that he deliberately did not tell the truth on November 20, 1997.

### Conclusion

Having conducted the hearing ordered by the Court of Appeals, this court finds, for the reasons stated in this Memorandum, that there was neither an agreement in effect between the parties nor a promise made by the government that Francisco Rosario would receive transactional immunity for falsehoods told on September 22, 1997 in return for truthful statements on November 20, 1997. It further finds that all parties understood that Rosario's truthfulness at an interview conducted on November 20, 1997 would be decided by the prosecution. It finds that the prosecution's conclusion that Rosario deliberately lied on that date was honestly conceived and reached in good faith. Indeed, were this court the proper party to evaluate Rosario's truthfulness, it would also find that he had been deliberately untruthful.

The case is hereby returned to the Court of Appeals.

*SO ORDERED.*